CARMEN CORREA per se and in representation of minor LUZ DELIA RIVERA, Plaintiffs and Appellees, v. PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. 12033. Submitted February 12, 1960.—Decided June 29, 1961.

*Gabriel Guerra-Mondragón* and *Antonio M. Bird* for appellant.
*Juan Nevares Santiago* for appellees.

Mr. Justice Santana Becerra delivered the opinion of the Court.

In this case of damages for the death of Feliciano de Jesús the negligence was accepted. The cause of action or the right of plaintiffs Carmen Correa and Luz Delia Rivera to receive compensation was left in litigation. The trial court determined the following in its findings of fact:

(1) that plaintiff Carmen Correa lived in public concubinage with Feliciano de Jesús in the Sabana ward of Luquillo for more than 19 years;

(2) that during all that time Carmen Correa was married to Julio Rodríguez, although she was separated from the latter;

(3) that Feliciano de Jesús and Carmen Correa were foster-parents of minor Luz Delia Rivera, and both plaintiffs depended entirely on Feliciano de Jesús for their basic needs, including medicine, clothing and food;

(4) that Feliciano de Jesús died on July 8, 1954 when he came in contact with a high voltage cable fallen to the ground belonging to the Water Resources Authority, defendant herein.

Invoking § 1802 of the Civil Code, the trial court decided, as a question of law, that plaintiffs had a cause of action to recover damages, and rendered judgment whereby defendant

was ordered to pay $5,000 to Carmen Correa and $2,000 to minor Luz Delia Rivera, by way of damages, with costs and $600 for attorney's fees.

The award of damages as a question of law is the only error which appellant raises before us. The findings of fact of the trial court are correct and are wholly supported by the evidence. However, and with a view to the right of compensation which we shall maintain, it is convenient to point out certain specific facts which appear in the record of the case, within the scope of the conclusions of the trial court.

Carmen Correa and Julio Rodríguez Rivera were married on June 15, 1934. They lived together for about one year. In 1937 she and Feliciano de Jesús already lived together as husband and wife under the same roof, in a public housing project of the "P.R.R.A." in the ward of Sabana of Luquillo. They lived there for many years. The concubinage between De Jesús and Carmen Correa was public, without any interruption whatsoever, appearing to be husband and wife. and no other woman whatsoever being linked during this time to De Jesús, and this relationship lasted until the latter died in 1954. Julio Rodríguez Rivera also lived with another woman with whom he had three children.

Carmen Correa was about 60 years old. Feliciano de Jesús died at the age of 42, and as it was determined by the Manager of the State Insurance Fund who declared that the death was compensable as a labor accident, he earned $3.05 daily. The Manager also determined (the trial court had before it the direct evidence on the matter), that De Jesús lived "in public and honest concubinage" with Carmen Correa for a period of 19 years, without having any children and without his ever having been married. He determined that Carmen Correa and Ana de Jesús, mother of the deceased depended on him for their maintenance. To the extent within which the Manager found this dependency,

he divided the compensation proportionately in 80 per cent for Carmen Correa and 20 per cent for the mother. The funeral expenses were charged to the compensation of both of them. The Manager of the Fund sued the Authority in substitution of Ana de Jesús' rights, and the suit was settled out of court.

Minor Luz Delia Rivera was the natural daughter of Carmen Correa's youngest daughter, that is, her granddaughter. The identity of her father was unknown and she was taken in at the age of three months by her grandmother, at the request of De Jesús, who wished to have the child with him, and they raised her as her parents in their home. The child called them "father" and "mother" and it was stated at the trial held on April 9, 1956, that she was three years old. She was about one year and three months old when De Jesús died, and had been in his company for one year, more or less.

The question to be decided turns on defendant's obligation to compensate plaintiffs for the death of De Jesús, which was due to the negligence of the former. Sections 1042, 1046, and 1802 of the Civil Code, (1930 ed.), 31 L.P.R.A. § § 2992, 2996, 5144,[1] are applicable.

Section 1802 provides insofar as applicable to this case thus: "A person who by an act or omission causes damage to another, when there is fault or negligence, shall be obliged to repair the damage so done." From the first time—Gonzáles v. San Juan L. & T. Co., 17 P.R.R. 115 (1911), an action exercised by the mother arising from the death of a minor son—we have always held that the sub-

---

[1] Section 1042: "Obligations are created by law, by contracts, by quasi contracts, and by illicit acts and omissions or by those in which any kind or fault or negligence occurs".

Section 1046: "Those arising from acts or omissions, in which faults or negligence, not punished by law, occur, shall be subject to the provisions of chapter II, of Title XVI, of this Book". (Sections 1802 to 1810.)

stantive cause of action to claim damages for the death of another for fault or negligence is the aforesaid § 1802.[2]

As to the basic problem of who may exercise such a cause of action under the general principle of § 1802 in the absence of other express legal provisions, and which is presented to us in the doctrine as a problem always open to discussion as to which there is a conflict of views in the case law, and of authors and commentators, within the range of cases presented to us, our law has already assumed a sufficiently clear and definite position which follows the more liberal and at the same time the more just aspects of the doctrine.[3]

---

[2] In two previous cases of death—*Pérez* v. *The American R. R. Co. of Porto Rico*, 9 P.R.R. 196 (1905), an action is brought by a father for the death of a natural son; and *Marrero* v. *López et al.*, 15 P.R.R. 746 (1909), death of plaintiff's son by an overseer, where the liability of § 1803 was invoked—the problem was not discussed. And see: *Zalduondo* v. *Sánchez*, 15 P.R.R. 216 (1909).

[3] As long as the provision continues to be so general, "a person who by . . . causes damage *to another*," the afore-mentioned problem shall not cease to be discussed unless it becomes possible to fix limits upon human relationships. Puig Brutau points out a commentary by F. H. Lawson, very much to the point, as a matter of fact, to the effect that Roman Law in the aspect concerning us now, is characterized by the simplicity of its principles and vocabulary, while English law is poor in principle but rich in detail. And Puig Brutau says:

"Of § 1.382 of the French Civil Code, F. H. Lawson has said that it reads like a manifesto, which seems to be a proclamation of principle. It thus happens also in the corresponding § 1.902 of our Civil Code: 'any person who by an act or omission causes damage to another by his fault or negligence shall be liable for the damage so done.' As we know, it is not a question of a strict rule, since it does not attribute a specific consequence to hypothesis which might also be provided with detail, but it is limited to pointing out the starting point for the line of reasoning which is to decide whether a particular case falls within the normative ambit of the code. In an article such as the one copied above we understand that the judges' duty can not consist in the *mere investigation* of whether a fact is included in the legal provision, for in such a case his inevitable duty consists in *deciding whether it should be included or not. The jurist's work is noticeably creative here because it is to ascertain which interests should be entitled to juridical protection instead of limiting it to the comprobation of which is already acknowledged as such.*

"That which we have affirmed is not altered by the fact that the oft-mentioned section is many times applied unquestionably to particular

144

Since the case of González, *supra*, in 1911, and until the advent of *Ruberté v. American R. R. Co.*, 52 P.R.R. 457,[4] in 1938, the cases which came under our consideration dealt with parents for the death of their children and of the latter for the death of the former, wherein even though the damages

situations. When it is a question of such generalized language, the accuracy and precision in the result is a consequence of the traditional criterion by which certain facts *are included* and others *are excluded* in the event that the provision is applied. It could be affirmed that the dividing line between the included facts and the excluded facts may not be drawn by he who merely reads the words of the section, but it depends on the fact of admitting the precedents which have interpreted it and on the new facts which may warrant a change of opinion. It is sufficient to examine the decisions that have been rendered on this matter during the last few years in different countries to appreciate the following truth: *the casuistry rules primarily everywhere. . . ."* And he continues:

"It is necessary to bear in mind that the general or particular character of the rules of law not only depends on their own drafting, but on the novatory or reiterated character of the facts that are to be regulated juridically. It often happens that by an alteration of circumstances, the rule which seemed to be a precise clue for deciding the conflict of interests becomes a simple premise of the judicial reasoning. The conflicts of interests arising from the conditions of social life as they develop should be regulated by adequate norms, although frequently such adequacy should be secured slowly but incessantly, as a result of constructive interpretation. Precisely, this need, that a general rule should give way to other more concrete rules that might conform to the body of the new facts, represents a force which tends to destroy every positive system of rules in a complexity of empirical views which, in turn, shall require reframing consisting of general rules in the way of a renewed premise for the casuistry." (Italics ours.) II *Fundamentos del Derecho Civil* 659–665 (1956).

[4] In *Díaz v. P. R. Railway, Lt. & Power Co.*, 21 P.R.R. 73 (1914); *Rivera v. Reyes*, 31 P.R.R. 420 (1923); *Arreche et al. v. P. R. Ry., Lt. & P. Co.*, 31 P.R.R. 424 (1923); *Maldonado v. Hamilton*, 32 P.R.R. 208 (1923); *Orta v. P. R. Railway L. & P. Co.*, 36 P.R.R. 668 (1927); *Carbou Rodríguez v. Mir*, 36 P.R.R. 728 (1927); *Heirs of Peraza v. Marín*, 40 P.R.R. 341 (1929); *Izquierdo v. Andrade*, 44 P.R.R. 406 (1933); *Dávila v. P. R. Ry. Lt. & P. Co.*, 44 P.R.R. 923 (1933); *López v. American Railroad Co. of P. R.*, 50 P.R.R. 1 (1936); and *Parrilla v. Loíza Sugar Co.*, 52 P.R.R. 232 (1937), except the case of *P. R. Ry., Lt. & P. Co. v. District Court*, 38 P.R.R. 305 (1928), in which the action was brought by the injured party itself and when she died we held that the rights were transmitted to the heirs; and the case of *Pérez v. Succrs. of M. Pérez & Co.*, 41 P.R.R. 844 (1931), in which we decided that the heirs and not the judicial administrator could bring suit.

were invoked in their own right, there was also present the condition of plaintiff being an heir or an alleged heir.[5]

In the *Arreche* case, *supra*, we stated that the general rule established by § 1802 of the Civil Code was made specific in § § 60 and 61 of the Code of Civil Procedure, as to the cases provided for in said sections. In this case we denied a mother the right to claim directly on the basis of this section, in addition to the action brought by the plaintiff's father under § 60.

The case of *Ruberté* v. *American R. R. Co.* presented to us for the first time a cause of action for death *iure sanguinis*. Plaintiff did not have the status of the deceased's heir (there were legitimate children), but that of a relative: plaintiff was his father. Considering § 143 of the Civil Code—31 L.P.R.A. § 562—as to the reciprocal duty of ascendants and descendants to support each other, we stated: "The fact was that Justo Ruberté not only had a duty to support his father but *actually contributed to the support*. The negligence of the defendant being established, it follows that a cause of action arose in Pablo Ruberté by reason of the death of his son," citing § 1802. (Italics ours.)

Shortly afterwards, in *Rodríguez* v. *Ell Tee, Inc.*, 57 P.R.R. 930 (1941), we had before us another case of the same nature, in which plaintiff claimed damages on her own right for the death of her sister, alleging that she was her nearest relative and had suffered damages "resulting from her mental suffering, the loss of the love and affection of her sister, and of the material aid which she received from the latter. . . . ." This time we held that the evi-

---

. [5] After the *Ruberté* case, a similar situation was presented in *Méndez* v. *Serracante*, 53 P.R.R. 807; *Rivera* v. *Olabarrieta*, 58 P.R.R. 436 (1941); *Soto* v. *Luchetti*, 58 P.R.R. 715 (1941); *Asencio* v. *Am. Railroad Co.*, 66 P.R.R. 218 (1946); *Rojas* v. *Maldonado*, 68 P.R.R. 757 (1948); *Vargas* v. *Alers*, 69 P.R.R. 215 (1948); *Cedeño* v. *Tropical City Industries*, 71 P.R.R. 586 (1950); *Díaz* v. *Water Resources Authority*, 71 P.R.R. 872 (1950); and *Fournier* v. *Fournier*, 78 P.R.R. 411 (1955).

dence failed to show that the plaintiff was dependent on the deceased for her support, but further on we stated that even assuming that she was dependent on the latter for her support, she was not entitled to compensation if the circumstances enumerated in said § 143 did not concur.[6]   Accepting the fact that in default of legitimate or legitimated ascendants and descendants the collateral relatives shall inherit, we stated that this does not mean that each collateral relative can by himself or herself bring a separate action for damages [a principle followed by us also in the cases of forced heirs, wherein it is necessary to allege that plaintiff is the sole heir, or that he would join all of them] and also not only was there no allegation that the plaintiff was the sole heir of the deceased, but neither was it alleged that the latter died without a will, an indispensable requisite for the legal succession to take place, including the collateral relatives.   We allowed plaintiff to amend her complaint. And see: *Acosta* v. *Crespo*, 70 P.R.R. 223 (1949), where in view of the allegation that the sister had not alleged or proved a cause of action in her favor, we stated at p. 241: "She alleged and testified that she was the sole heir of her brother.   She also testified that she depended on her brother for support.   These facts were sufficient to entitle her to sue for his wrongful death." *Rodríguez* v. *Ell Tee, Inc.*, 57 P.R.R. 930; § 143 of the Civil Code, 1930 ed.[7]

Up to this case we had sustained actions for damages due to death in which even if they were filed in their own right—not as an hereditary patrimony—plaintiff also possessed the condition of being an heir or an alleged heir,

---

[6] According to subdivision 5 of this section the obligation to support exists between brothers and sisters when through a physical or mental defect or for any other cause not the fault of the person requiring support, the said person can not provide for himself.

[7] We quote § 143, although nothing was stated about the situation required by subdivision 5 for support between brothers and sisters.   We had to emphasize the fact that the support and livelihood of the sister had been proved as a question of fact and reality.

except for the case of Ruberté in which without being such heir, the action was predicated on the obligation of support between the ascendants and descendants provided by § 143, in the light of the fact that *in truth* that son contributed to the support of the plaintiff father.

Such was the state of our case law when the case of *Travieso* v. *Del Toro*, 74 P.R.R. 940 (1953) was decided, wherein an acknowledged natural daughter filed a complaint by reason of the death of her father. The legitimate father of the victim filed a petition for intervention and claimed he was a forced heir. The petition for intervention was dismissed by the trial court because the father was not entitled to any hereditary rights in the testate inheritance because of the existence of an acknowledged natural daughter. We supported the trial court on this point. But, in reaffirming once more that the original source for claim for damages for the death of a person is § 1802, we stated that a claimant technically need not be an heir, it being enough if he is the father of the victim, and that he has suffered damages due to his condition and relation as parent, considering the destruction of his actual or potential right to receive support *and the permanent suspension of the prospective benefits that he might have received from his son.* We clarified a concept which had been debated until then within a somewhat indefinite field, which is, that even within the purview of the above-mentioned § 61 of the Code of Civil Procedure, or under § 1802 of the Civil Code, the right of action for death is not part of the hereditary patrimony of the victim, and it is not transmitted according to the law of successions. This question has been the object of many debates and of contradictory opinions in the doctrine, but unquestionably we adopt the prevailing opinion, and at least until the present time, there is no serious reason or ground for not letting it prevail as a permanent criterion in our law. We decided that the father-intervener could file suit under

§ 1802, notwithstanding the action of the daughter, since the parent-child relationship is such that the parent when his child dies, loses his right to support established by § 143, *and even if the father did not actually and effectively receive support*, at the time of the child's death, he loses the reasonable expectancy of pecuniary benefits inherent in that relationship. However, we did not stop there. Aside from the economic factor we stated that the judge should bear in mind the elements of love and affection in considering the damages, including the mental sufferings of the parents.

In *Vázquez v. People*, 76 P.R.R. 556 (1954), we upheld the right of brothers and sisters to receive compensation for the death of one of them, under circumstances in which, different in part from the situation in the previous case, the existence of material or economic damages was not alleged or involved, but only the suffering and mental anguish and *loss of the company of the deceased*. We held that the broad and general terms of § 1802 allowed no distinction to be made exclusively between physical and moral damages, and if the latter are the natural consequences of the fault or negligence, they should be recoverable by themselves. Following the doctrine of these last cases, in *Hernández v. Fournier*, 80 P.R.R. 94 (1957), we did not accept that a complaint brought by the parents for the death of their daughter, who in turn had a legitimate daughter, and alleging that she lived in their own home sharing with them her love and affection and giving them spiritual, material and financial aid, as well as having suffered deep mental anguish and that they had been deprived of the company, affection and love of their daughter, failed to adduce a cause of action because it did not allege that they were the sole heirs or dependents of the victim.[8]

---

[8] At the end of the opinion in the *Vázquez* case, we pointed out the problem of the identity of the persons who may claim indemnity for mental sufferings exclusively—whether such right should cover those persons who, having no relationship with the deceased, proved the existence

In the direction pursued by our case law, giving full meaning to the clear and simple provisions of § 1802, which as it has been classified by Puig Peña "is a broad *blanket type* [author's italics] which rules every norm of the extra-contractual responsibilities *which the law extracts from the multiple facets of real life*" [9] (italics ours); and as Castán indicates with respect to the *aquilian culpa* represents a damage without any preceding juridical relation "except for the generic duty, common to all men, of not causing damage to another *(alterum non lædere)*"; [10] and that "all damage whether material or moral, gives rise to reparation once the damage is real and proved", [11] we shall now face a situation wherein none of the legal bonds in which this matter has traditionally been debated are present, neither that of the spouse nor of consanguinity or relationship, whether or not the condition of heir concurs therewith, and neither the legal bond of support, although one of fact is present, wherein plaintiff and the deceased, who was not known to have any other home or woman, lived maritally under the same roof for at least 19 years and until the death of the latter, *more uxorio*, living a common life in the material and economic aspect as well as in the line of affection. In his broad discussion as to who could demand compensation, Colombo,[12] in the light of § 1079 of the Argentine Civil Code. substantially identical in the concept of damage to another, maintains the action by the party who was directly or indirectly aggrieved "despite the fact that no family bond ties him to the main victim of the event. The case would be,

---

of the damage and their sufferings or anguish. It seemed unnecessary to decide that problem since in that case the sisters and brothers of the deceased, were situated in a category which was obviously permissible. The same situation prevailed in the *Fournier* case where the parents were the plaintiffs.

[9] IV-11 *Tratado de Derecho Civil* 571 (1951).

[10] I-II *Derecho Civil Español, Común y Foral* 489 (1955).

[11] IV *Id.* p. 822 (1956).

[12] *Culpa Aquiliana* 708 *et seq.* *(quasi-delictors)*.

simply that of the concubine who loses her companion in a train crash and has no means to support herself and the children had during the irregular union." Colombo believes, as does Salvat,[13] that the right of brothers and sisters to demand compensation "should be recognized as long as they can prove a personal and direct prejudice . . ." and that "the same should be applied to the concubine, who if joined to her companion merely by bonds of affection or of convenience and is not his forced heir—except in certain cases of undoubtful sexual aberrations—it is hard to understand 'the decisive motive for excluding her from the general and absolute terms' of the above-cited rule." (Section 1079 Argentine, 1802 ours.) He observes, further on: "If a person *who is not united* [author's emphasis] to the victim by any bond or relationship, suffers a prejudice due to her death following a criminal or quasi-criminal act, we have already said . . . that he may claim the corresponding compensation . . . This means, then, that compensation admitted by the Code is, according to the principles of justice and equity, as complete as possible. . . . It matters little, therefore, that the prejudiced party may or may not be a succeeding relative or forced heir of the deceased. From the time he is able to prove the damage received, there is no reason for denying him the compensation. Will this lengthen the list of plaintiffs too much, as Machado * fears? We do not see the danger, and neither will he who examines the matter without passion or partiality. The third party sues because the disappearance of one of his relatives has caused him an injury. If this injury is properly proved, it shall be as important to him as a direct attempt against his life or property. Why, then should he be precluded from acquiring the corresponding compensation?" More par-

---

[13] Colombo refers to *"Hechos Ilícitos"* by Dr. Raymundo M. Salvat.

* José O. Machado, *Exposición y Comentarios del Código Civil Argentino.*

ticularly as to the concubine, Colombo admits, who certainly is on the margin of the moral and the law, but as long as she does not try to take advantage of the illegitimate relations "there is nothing to preclude her from filing any proceeding to obtain the corresponding compensation if she suffers real prejudice arising from the death of her companion". Her situation is the same as that of a third party who suffers damages.[14]

Aside from the exposition of the diverse opinions of the authors and text writers, some more exacting and other less conservative, on the problem of who may claim under such a general provision and at the same time of such precise language as that of § 1802 of our Civil Code, and of their counterparts in the latin codes, two judgments have been mentioned in these studies which established a negative rule in the action of the concubine, both based on the same legal premise. In Italian jurisprudence, the judgment of the Supremo Collegio of March 24, 1938 cited by Montel *op cit.* at p. 73, and which according to his comments, answers the premise in the doctrine of that country that a right should exist between the victim and the plaintiff injured by the wrongful act, and if a less strict criterion should prevail in such a situation, the result would tend to establish, as to damages arising from death, an interpretation of § 1151 of the Italian Code entirely different from that which was constantly given to said norm regarding any other field.

The second is that of the French Court of Cassation of July 27, 1937. Dalloz *Jurisprudence Generale* 1938. In

---

[14] If it is not always a question of the specific concubine, see, as to the general extension of § 1802: III Borrell y Soler, *Derecho Civil Español* 606 (1955), "Who may claim compensation for extra-contractual liability?"; Borrell Macia, *Responsabilidades Derivadas de Culpa Extracontractual Civil* 327 (1958); "Who May Claim Compensation for Damages?" V Giorgi, *Teoría de las Obligaciones* 293 (1929), "Of the Action for compensation for damages. Who May Bring It?"; studies by Alberto Montel on *Problemas de la Responsabilidad y del Daño* with notes of Spanish law by J. Roca Juan, Chapters I to VII (1955).

France the action of the concubine had been acknowledged and as pointed out by the Mazeaud professors,[15] the Court of Cassation made a distinction according to the stability of the concubinage and it admitted that if it lasted long enough, it should be assumed that it had not been dissolved, thereby concluding that the concubine alleged in that case a prejudice which was not hypothetical, but certain; and that applying for the first time as a legal premise the need "of a legitimate interest juridically protected" the Court of Cassation affirmed this time that a concubine did not justify such an interest, thereby denying the action. Notwithstanding such doctrine which demanded a legitimate interest juridically protected and an injured right, which did not exist in the concubine's claim because of the absence of a civil obligation for support, these authors comment that the general rule has not been maintained and that today the bond of the obligation to support is no longer required, the principle of the reparation of the prejudice caused to a brother or sister for the death of another having been acknowledged where no civil obligation to support existed among them.[16]

---

[15] II *Lecciones de Derecho Civil* 361 *et seq.*, Part II (1960).

[16] The Mazeaud professors point out the concern in the French case law with the so-called "rebound damages" and the number of actions which could arise, and they set forth that the Court of Cassation has striven to do away with the multiplicity of suits and has been led to limit the possibility of attempting an action of civil responsibility. They explain thereby the limitations which the French jurisprudence has introduced into the general principle of § 1382 of the French Code which, it has been said, does not require in principle any particular requisite to be a plaintiff but to be a victim, thereby limiting the circle of persons who may bring an action for damages. Up to a certain point we have laid aside that concern when we stated in the *Travieso* case that it might be undesirable and unfair to allow a multiplicity of suits against a person by virtue of a single tortious act, but on one hand, said result is permitted by § 1802, which section we must observe and obey, and on the other hand, no injury should go without reparation; and by what we stated in the *Vázquez* case, that the fact that the rule which permits compensation for moral damages exclusively might open the doors to fraudulent, fictitious or simulated claims, should not be an argument for implying the nonobservance of the broad and general terms of § 1802, and the courts should not deny compensation for damages

In the light of the evolution of our own case law, as well as following the most logical reasoning of those authorities who situate under the principle proclaimed in § 1802 every *"another"* who suffers prejudice and proves it, in the face of the problem now before us, we are not inclined to establish as a general rule of law—with complete abstraction of the facts and circumstances involved in each case— a restrictual and exclusive criterion as to who may claim within the juridical scope of said section. We had already definitively discarded the premise of the *ius hereditatis* in the cases of immediate wrongful death. As a general rule of operation and in abstraction of every other fact, the scope of said § 1802 should not be limited either to the *ius sanguinis* or to those cases in which a right previously protected between the victim and plaintiff is injured, as it has been judicially restricted by the French authorities aiming to avoid multiplicity of suits; this being a ground which in an evaluation of consequence we have not given it such a decisive weight, as we pointed out in the afore-mentioned footnote 16.

We must resort to the casuistry mentioned by Puig Brutau at the beginning which primarily rules everywhere, and as he points out, undertake the creative task of determining what interest should enjoy juridical protection, and what is excluded and included in the face of the new facts; and we must search, as Puig Peña states, for "the extra-contractual responsibilities which the law extracts from the *multiple facets of real life.*"

Of course, this casuistry should be governed by a sound judgment and reasonable and weighed standards in the evaluation of each case, so that from a good and just principle of law no distortion be made of the image of the law. In view of the facts and circumstances of the case before

---

really suffered simply to avoid an increase of suits; false claims are common in all branches of law and it is the business of the courts to distinguish between genuine claims and false ones.

154

us—among them a 60-year old woman with the natural limitation of her age to earn a living and to face the other material needs which the victim, who was 42 years old at his death, had supplied for many years; that she lost that material protection, and in the line of affection the company and society of the deceased, to whom she had been united for many years—the compensation for damages which the trial court granted to Carmen Correa shall be upheld.[17] As Díaz Pairó [18] states, "Damages in general shall be the difference between how the victim stands before suffering the wrongful act and how he stands thereafter."

    Defendant argues as a ground for refusing the compensation that Carmen Correa's cause of action "is derived" from the illicit relations indulged by her in open violation of the penal laws which punish adultery. Her cause of action accrues from § 1802 for an act in which there was fault or negligence and caused damages. Perhaps what defendant wants to maintain rather is that because of the unlawfulness of her relations with the victim, the courts should not compensate the damage done.[19] If as a question

---

[17] The trial court did not express the concept of damages granted. Although it would be as to take away from the nature of the real facts to believe or assume, for the sole reason that she is a concubine, that she did not suffer moral damages in the line of affection, since it has been shown that she suffered material damages and we shall not alter the amount granted, it is unnecessary, aside from the fact that no question whatsoever is raised as to this matter, to distinguish here and now between one and the other concept of damage.

[18] II *Teoría General de las Obligaciones* 61 (1954).

[19] There are French text writers who believe so. The Mazeaud approve of the change made by the Court of Cassation in the judgment of July 27, 1937, arguing that every concubinage is immoral and illegal, contrary to the legal rules of the constitution of the family—*op. cit.* at 362. Although they are "surprised not to find in the Civil Code a formal prohibition of concubinage," they admit the existence of legislation which brings the concubines to the level of the widows regarding war pensions, and that which allows the widow of the officer living in concubinage to keep the pension, although her rights are diminished. III *Lecciones de Derecho Civil*, Part I, "*El Matrimonio y la Unión Libre*" 51–55. Planiol states that jurisprudence admits the action not only when the aid was due to a legal obligation, but also when it was voluntarily

of law her claim is based on the existence of damages once they are proved, in the prevailing juridical order, which is less conventional but more human as to the extramarital relations in general, we shall not refuse to repair damages solely on these considerations. Our mission now is not that of reforming customs of social cohabitation, as ancient as the very laws that govern the community. In a related sphere, that of support under our labor accident laws, the concubine's right to compensation is acknowledged, even when the widow concurs, as a question of public policy in this type of relief. On the other hand, there are the filial laws approved in 1942, which although in other concepts, as a question of public policy, do not repudiate the extramarital relations. And this Court, following advanced social criteria, has recognized in its decisions a certain economic system which at times partakes of the community partnership, between persons who live as husband and wife, in protection of the patrimonial interest of the concubine.

██ Considering the facts and circumstances of this case, the separate compensation awarded to minor Luz Delia Rivera, shall not be sustained. The damages, even the moral ones, must be actually sustained and suffered by the claimant. At her tender age this child had been depending upon the deceased for a brief period and thereafter she was left under the guardianship of her grandmother who has been materially compensated. And she was too small to be admitted as having sustained mental anguish and sufferings.

The judgment appealed from is modified, eliminating the compensation of $2,000 granted to the minor, and as thus modified, it is affirmed.

---

provided for and by virtue of a simple moral obligation, but it has shown some uncertainty when the aid has seemed *somewhat immoral,* and that therefore, the courts in certain cases have granted to the concubine reparation for the support which her lover had provided her, and in others they have been denied to her in order to preclude her from obtaining a benefit from her immorality. VI *Tratado Elemental de Derecho Civil* 536 (12th ed., 1943).